*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CM-1144

IN RE: TIMOTHY MOORE

Appeal from the Superior Court
of the District of Columbia

(CCC-10-18)

(Hon. Fern Flanagan Saddler, Trial Judge)

(Argued November 24, 2020                    Decided March 10, 2022)

*Cecily E. Baskir* for appellant.

*John D. Martorana*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time, and *Caroline S. Van Zile*, Principal Deputy Solicitor General, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and FISHER, *Senior Judge*.

BECKWITH, *Associate Judge*:  Appellant Timothy Moore was convicted at a bench trial of two counts of criminal contempt[1] for violating a civil protection order (CPO) that generally required him to stay 100 yards away from a woman who lived

---

[1] D.C. Code § 16-1005(f) (2012 Repl.).

in a houseboat in a marina where he also resided. Mr. Moore challenges the sufficiency of the evidence that he violated the CPO where the trial court credited his testimony that he did not understand that the CPO's exception for certain common areas within the marina did not extend to an events barge and a walkway at the marina. We conclude that the trial court erred in determining that the undisputed evidence that Mr. Moore received the CPO and had notice of its terms was sufficient in this case to establish that he willfully violated the CPO, notwithstanding the court's finding that Mr. Moore had misunderstood the CPO's terms. We therefore reverse Mr. Moore's convictions of contempt.

## I.

Mr. Moore and Jo Kemper lived on separate houseboats on the same dock within a marina in Southwest Washington, D.C. In November 2017, the trial court issued a temporary protection order (TPO) against Mr. Moore in connection with a civil case between Mr. Moore and Ms. Kemper. The TPO barred him from coming within twenty feet of Ms. Kemper, her dog, and her houseboat's dock, and in order to comply with the restrictions, he moved his houseboat to the dock furthest from hers within the marina. The following January, the trial court issued a CPO against

Mr. Moore upon a finding that he violated the TPO.[2] The CPO barred Mr. Moore from coming within 100 yards of Ms. Kemper, her dog, and her boat, except for on "shared premises," in which case Mr. Moore was required to stay only twenty feet away from Ms. Kemper and her dog. The CPO defined shared premises as the marina's laundry room, parking lot, mailbox, and shower room.

The government subsequently charged Mr. Moore with two counts of criminal contempt, alleging that he had violated the CPO by coming within 100 yards of Ms. Kemper and her boat on two occasions in April 2018. At trial, Ms. Kemper testified that on April 7 she saw Mr. Moore on the events barge in the marina and that the events barge was within 100 yards of her boat.[3] She also testified that on April 11 Mr. Moore came within 100 yards of her while walking his dog on an elevated walkway above the marina's main dock. Testifying in his own defense, Mr. Moore did not dispute that he was within 100 yards of Ms. Kemper while he was on the barge and on the walkway. But he stated that he had no experience with the CPO process or criminal proceedings and that his understanding after the hearing was that

---

[2] The government charged Mr. Moore with one count of criminal contempt for the alleged TPO violation and later amended the information to add the charges now at issue on appeal. Shortly before trial, the government dropped the TPO contempt charge.

[3] Ms. Kemper took photographs of Mr. Moore while he was on the barge, and the government introduced the photos into evidence.

the 100-yard stay-away applied "outside of the marina area." Within the marina, he "thought that 20 feet was the magic number . . . . [S]tay 20 feet away, and I'm good."[4]

In its findings, the trial court credited Ms. Kemper's testimony that she saw Mr. Moore within 100 yards of her or her boat on both dates. The court also credited Mr. Moore's testimony regarding both days, including that on April 7 he "believed that the terms of the CPO required that he only be 20 feet away from Ms. Kemper and dock C while on the Gang Plank Marina property." The court stated, however, that "[p]roof of the intent element only requires proof that the defendant intended to commit the actions constituting a violation of the court order." Citing this court's decision in *In re Jones*, 898 A.2d 916 (D.C. 2006), the court said that "due process requires that notice to parties must be of such nature as to reasonably . . . convey the required information" and contempt could be established if the order was "clear and reasonably specific." The trial court therefore found that because the CPO "specifically and clearly" stated the terms of the 100-yard stay-away, Mr. Moore committed criminal contempt on both April 7 and April 11 "by coming within 100

---

[4] Mr. Moore testified that he was unrepresented by counsel at the January 2018 and February 2018 contempt hearings when the court "strongly advised [him] to get an attorney." Eventually, and after Mr. Moore retained counsel, the trial court granted Mr. Moore's request to modify the CPO to include the events barge as a shared premise subject to the twenty-foot stay-away provision.

yards of Ms. Kemper's person" in violation of the CPO.

Mr. Moore asked the court to reconsider the guilty verdicts, arguing that contempt was a specific intent crime and that the trial court's finding regarding his mental state could not support the verdict. The trial court rejected this contention, stating that criminal contempt was a "general intent crime" and that there were "no indications that [Mr. Moore] did not understand the contents or implications of the Civil Protection Order when it was issued on January 19, 2018." The court reiterated that "a defendant willfully disobeys a known court order by intentionally committing the act that violates the terms of the order" and that Mr. Moore did not violate the CPO "by mistake." At sentencing, the court further stated that it was "not relevant whether defendant believed on the dates that he violated the CPO [sic] what he believed on those dates."

## II.

On appeal, Mr. Moore contends that because (1) he did not understand the terms of the CPO on April 7 or 11, 2018, and (2) the trial court credited his testimony, the evidence is insufficient to prove that the violation was willful beyond a reasonable doubt. The government argues that its burden does not require proof of the defendant's "malicious intent" and that "it is enough that [the defendant]

intends to undertake that action, and that action happens to violate a CPO of which he has notice."

We review de novo whether "the defendant's acts, as found by the trial court, constitute a CPO violation." *In re Jones*, 898 A.2d at 919; *see also Cave v. United States*, 75 A.3d 145, 147 (D.C. 2013) (relying on the factual findings as made by the trial court despite additional testimony that "*if credited* would have been sufficient to convict"). "In so doing, we consider all the evidence in the light most favorable to the verdict, according deference to the factfinder to weigh the evidence, determine credibility, and draw justifiable inferences of fact." *Wicks v. United States*, 226 A.3d 743, 746–47 (D.C. 2020) (quoting *Foster v. United States*, 218 A.3d 1142, 1144 (D.C. 2019)) (cleaned up). To establish a defendant's guilt of criminal contempt for violating a court order, "the government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a protective court order." *Williams v. United States*, 51 A.3d 1273, 1278 (D.C. 2012) (quoting *Ba v. United States*, 809 A.2d 1178, 1183 (D.C. 2002)); *Hooks v. United States*, 977 A.2d 938, 939 (D.C. 2009). The offense requires "both a contemptuous act and a wrongful state of mind." *Williams*, 51 A.3d at 1278 (quoting *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003)); *In re Dixon*, 853 A.2d 708, 711 (D.C. 2004) ("[W]hereas civil contempt is more remedial in nature and requires no finding of intent."); *Swisher v. United States*, 572 A.2d 85, 89 (D.C. 1990).

The point of dispute between the government and Mr. Moore boils down to whether the trial court could properly conclude that Mr. Moore possessed a "willful" state of mind after it found that he did not understand the terms of the CPO when he committed the alleged violations. The term "willfully" is a "word of many meanings," but in general requires that the government show that the defendant acted with "knowledge that the conduct is unlawful." *Bryan v. United States*, 524 U.S. 184, 191, 196 (1998) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)); *Williams*, 51 A.3d at 1280 ("Willfulness necessarily entails knowledge that conduct is proscribed . . . ."). In *Williams*, for example, it "was not a correct statement of the law" for the trial court to instruct that "willfully does not mean that he knew he was breaking the law,"[5] and the jury could have misinterpreted the instruction to say that "the defendant need not have understood the terms of the stay-away order." *Id.* Instead, the government must prove not only that the defendant violated the order, but also that he comprehended the provision he violated. *Francis v. United States*, 256 A.3d 220, 228 (D.C. 2021) ("A defendant willfully disobeys a court order when he understands the order and intentionally commits an act that violates it."); *see also*

---

[5] Despite the error, the *Williams* court affirmed the appellant's conviction because under plain error review, the error did not affect his substantial rights. *See id.*

*Hooks*, 977 A.2d at 940.[6]

In the government's view, Mr. Moore's convictions can stand because he was "put on notice of the specific conditions of the stay away order" when he was served with the CPO in open court. *Vaas v. United States*, 852 A.2d 44, 46 (D.C. 2004). The argument that Mr. Moore need not have had a "wrongful or bad purpose" is understandable but ultimately misguided in the context of this case. At times, this court has described D.C. Code § 16-1005(f) as a "general intent statute"[7] and stated that "proof of the intent element only requires proof that the appellant intended to

---

[6] The government argues in the alternative that a contempt conviction may be sustained where the defendant "knew or understood, or should have known or understood," the terms of the court order. *Davis*, 834 A.2d at 868. Negligence was not relevant to the resolution of the appeal in *Davis*, however, and we cannot say that the court "meant to endorse a negligence standard within the meaning of the Model Penal Code." *See Wicks*, 226 A.3d at 749; *see also Hammond v. United States*, 77 A.3d 964, 968 (D.C. 2013) (quoting *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994)) ("A point of law merely assumed in the opinion, not discussed, is not authoritative."). In general, we are disinclined to read a negligence standard into a criminal statute in the absence of a "clear statement from the legislature." *Carrell v. United States*, 165 A.3d 314, 320 (D.C. 2017) (en banc); *accord Elonis v. United States*, 575 U.S. 723, 737–38 (2015); *Beachum v. United States*, 197 A.3d 508, 511–12 (D.C. 2018); *(Mark) Thompson*, 690 A.2d 479, 482–83 (D.C. 1997) ("Because the defendant's state of mind must be wrongful, however, we must not permit the adjective 'reckless' . . . to become a synonym for 'negligent.'").

[7] In *Carrell v. United States*, the en banc court reiterated its "previously expressed concern about the use of 'general' and 'specific' intent" and endorsed "more particularized and standardized categorizations of mens rea." 165 A.3d at 324–25.

commit the action constituting violation of the court order." *Thomas v. United States*, 934 A.2d 389, 393 (D.C. 2007) (quoting *Ba*, 809 A.2d at 1183) (cleaned up); *accord Jones v. Harkness*, 709 A.2d 722, 723–24 (D.C. 1998). But "[o]ne cannot be contemptuous of a court order if he has no knowledge of it," *In re (Raymond B.) Thompson*, 419 A.2d 993, 996 (D.C. 1980), and so the government must first establish that Mr. Moore "understood the terms of the court order," *see Williams*, 51 A.3d at 1280; *e.g.*, *Francis*, 256 A.3d at 228. "Often such knowledge is demonstrated by proof that the defendant was present in open court when the order was issued and explained." *Hooks*, 977 A.2d at 940; *see also In re (Raymond B.) Thompson*, 419 A.2d at 995. But often is not always. Notice of the CPO in open court does not necessarily prove willfulness if a person subject to a court order introduces evidence demonstrating otherwise.[8] At that point, the factfinder "is always free to accept or reject the defense evidence." *Wilkins v. United States*, 137 A.3d 975, 982 (D.C. 2016) (quoting *Trice v. United States*, 525 A.2d 176, 182 (D.C. 1987)); *e.g.*, *Holmon v. District of Columbia*, 202 A.3d 512, 522 (D.C. 2019)

---

[8] We have assessed the government's proof of willfulness this same way in the context of a contempt offense for failure to appear under the Bail Reform Act: "If a defendant believes that special circumstances make his failure to appear *not* willful, he bears the burden of bringing that evidence before the jury. However, if the jury rejects the defense evidence, the statutory inference [of guilt based on notice of the date] remains in the case and provides a sufficient basis for a verdict of guilty." *Wilkins v. United States*, 137 A.3d 975, 982 (D.C. 2016) (cleaned up).

(concluding that trial court was "not required to infer" from Mr. Holmon's testimony that he "pocket dialed" the complainant and permissibly "relied on other evidence to infer that appellant intentionally made those calls").

This court's cases have recognized that notice to the defendant does not always prove willfulness. In *In re Ferguson*, for example, the appellant had called the complainant on the phone when "the CPO expressly prohibited" him from contacting her except "regarding the child." 54 A.3d 1150, 1154 (D.C. 2012). Because the complainant hung up before the respondent had an "opportunity to state why he was calling," we reversed, concluding that "[t]he evidence afforded the trial court no way of discerning, other than through speculation, what appellant's intention was when he placed the January 1, 2009 call to Keeton." *Id.* The fact that Mr. Ferguson placed a phone call was in itself insufficient to support the conviction. *See id.* We have similarly stated that "the court might be unable to find that the [defendant] willfully violated the CPO" if, for example, the person who had obtained the CPO approached the defendant "without his encouragement or consent," or if "the contact was necessitated by an emergency" or justified by "some type of 'compelling humanitarian consideration.'" *In re Shirley*, 28 A.3d 506, 512 (D.C. 2011) (footnotes omitted). And in *Hooks*, it was likewise "not enough for the government to prove that the [CPO] was valid." 977 A.2d at 940. "In order to prove willfulness, it also had to establish that appellant knew the order had been issued *and*

knew that it prohibited him from coming within 100 feet of the victim, her residence, and her automobile." *Id.* (emphasis added).

*Thomas v. United States*—the case on which the government primarily relies—is not to the contrary. 934 A.2d 389. Mr. Thomas argued on appeal that the evidence was insufficient to establish a willful violation "because there was *no evidence* about how he and Ms. Howard came to be within a foot of each other in the hall." *Id.* at 392 (emphasis added). Though Mr. Thomas suggested that "it was possible that Ms. Howard had called him over" first, *id.*, the court affirmed the contempt conviction because "[t]he government [was] entitled to the reasonable inference that hovering and talking loudly connotes willfulness, and that by engaging in this type of behavior, Mr. Thomas intended to commit acts constituting a violation of the CPO," *id.* at 393.

In the present case, the trial court concluded the opposite. Here, Mr. Moore testified that though he received notice of the CPO in open court, he did not understand its terms until after he had been charged with two new contempt violations and discussed the CPO with his lawyer. The trial court found that on April 7 and April 11 Mr. Moore "believed that the terms of the CPO required that he only be 20 feet away from Ms. Kemper and dock C while on the Gang Plank Marina property." And it did not retract its finding that this testimony was credible in

response to the motion for reconsideration.[9] The trial court's conclusion that the government had established willfulness—a conclusion it reached by focusing exclusively upon the clarity of the terms of the CPO to the exclusion of what it saw as "not relevant" evidence of Mr. Moore's state of mind at the time of the violation—stemmed from a misapplication of our case law to its findings of fact.

The trial court's unaltered factual finding was that Mr. Moore did not understand the terms of the CPO at the time of the violations. We otherwise have no evidence that Mr. Moore acted with a willful state of mind on either April 7 or April 11, 2018. *See, e.g.*, *Hector v. United States*, 883 A.2d 129, 134 (D.C. 2005) ("Hector's testimony at the hearing was neither implausible, incredible, nor inherently inconsistent, and the government provided no other evidence of guilt that may have corroborated an inference of willfulness."). And "[t]here is no basis for remanding the record for findings the trial court has already made." *Cave*, 75 A.3d at 147.

---

[9] Because the dispositive question is what Mr. Moore's mental state was on the dates of the charged offenses, April 7 and 11, we need not address the trial court's findings regarding Mr. Moore's understanding of the CPO when it was issued on January 19, 2018. *See Rose v. United States*, 535 A.2d 849, 852 (D.C. 1987) ("If either the actus reus—the unlawful conduct—or the mens rea—the criminal intent—is missing at the time of the alleged offense, there can be no conviction."); *accord Fleming v. United States*, 224 A.3d 213, 230–31 (D.C. 2020) (en banc).

## III.

"Since the facts found by the trial court are not sufficient to support the conviction," *id.*, we reverse Mr. Moore's criminal contempt convictions and remand to the trial court with instructions that it enter a judgment of acquittal on those counts.

*So ordered.*